J-S03044-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAI-MICHAEL HUDSON | : | |
| | : | |
| Appellant | : | No. 810 MDA 2025 |

Appeal from the PCRA Order Entered June 4, 2025
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004098-2020

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: FEBRUARY 19, 2026**

Jai-Michael Hudson ("Hudson") appeals from the order dismissing his first petition filed pursuant to the Post Conviction Relief Act.[1]  We affirm.

In 2020, police responded to a residence in Paxton Township following the receipt of a 911 call initiated by a child reporting domestic abuse at that location.  After knocking on the door to the residence, police encountered Hudson's paramour, Pamelita Roberts ("Roberts"), whom they observed to be crying, visibly upset, and bleeding from a scratch located on her cheek.  Within the residence, police additionally identified the child that had placed the 911 call, Roberts' ten-year-old son, who appeared similarly upset and as if he had been crying.  When speaking with police, Roberts informed them that she and Hudson had ended their relationship earlier that day, and that Hudson had

---

[1] *See* 42 Pa.C.S.A. §§ 9541-9546.

nonetheless visited her that night while she was sleeping. In expanding on the night's events, Roberts explained that she had woken up to the sound of knocking at her front door, and that when she opened the door to see who was there, Hudson entered her residence, threw her to the ground, and put his hands around her neck for approximately sixty seconds, restricting her ability to breathe. Roberts mentioned to police multiple times that, as this was happening, she thought she was going to die.

Police thereafter arrested Hudson, and the Commonwealth charged him with strangulation and simple assault. Following multiple continuances, the matter proceeded to a jury trial, at the conclusion of which a jury convicted Hudson of both charges.[2] The trial court deferred sentencing for the preparation of a pre-sentence investigation report, and on April 20, 2022, imposed a mandatory minimum sentence of ten to twenty years' incarceration

_____

[2] Notably, during the trial, Roberts recanted her initial statement that Hudson attacked and strangled her on the night of the incident. In doing so, Roberts instead testified that she was intoxicated that night and had only told her son to call 911 because she was upset about her recent breakup. However, to counter this narrative, the Commonwealth introduced Roberts' prior statement to police — that she had been strangled — via the testimony of the officer who responded to the incident, as well as his body-worn camera footage from the night of the interview. The Commonwealth also introduced a recording of the 911 call into evidence, during which Roberts and her son reported that Hudson had attacked her. Lastly, we highlight that the Commonwealth presented testimony from a police detective investigating the matter, who stated that a witness she spoke to indicated that Roberts and Hudson were still involved in a relationship at the time of trial, and in contradiction to Roberts' sworn testimony otherwise.

for strangulation, as Hudson was a second-strike offender,[3] with no further penalty imposed for the charge of simple assault. Hudson subsequently filed a timely post-sentence motion challenging the weight of the evidence, which the trial court denied. On May 4, 2023, this Court affirmed Hudson's judgment of sentence, and Hudson did not seek further review by our Supreme Court. *See Commonwealth v. Hudson*, 299 A.3d 874 (Pa. Super. 2023) (unpublished memorandum).

On February 26, 2024, Hudson filed a timely *pro se* PCRA petition,[4] his first. The PCRA court appointed counsel, who filed an amended petition arguing, *inter alia*, that Hudson's counsel at trial, Casey G. Shore, Esquire ("Attorney Shore"), was ineffective for failing to: (1) interview Roberts' son prior to trial or call him as a witness during trial, "as [Roberts' son] was the only other eye[]witness to the alleged incident[;]" and (2) interview Roberts prior to trial after she reached out to him and requested "to give him the

_____

[3] *See* 42 Pa.C.S.A. § 9714(a)(1), (a.1).

[4] Under the PCRA, a petition must be filed within one year of the date the judgment of sentence becomes final. *See* 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Pennsylvania Supreme Court, or the expiration of time for seeking such review. *See* 42 Pa.C.S.A. § 9545(b)(3). Here, because Hudson did not seek review by the Pennsylvania Supreme Court, his judgment of sentence became final on June 5, 2023, thirty days after this Court affirmed his judgment of sentence. *See* Pa.R.A.P. 1113(a) (stating "a petition for allowance of appeal shall be filed . . . within [thirty] days after the entry of the order of the Superior Court . . ."). Thus, Hudson had one year from this date, until June 5, 2024, to file his instant petition. As Hudson filed the instant petition on February 26, 2024, it is timely.

correct version of events." Amended PCRA Petition, 1/27/25, at unnumbered 14-19. The PCRA court held a hearing on the matter, during which it heard testimony from Attorney Shore, Hudson, Roberts,[5] and Roberts' son. We provide relevant portions of this testimony, beginning with that provided by Attorney Shore, as follows:

> [The Commonwealth]: . . . Attorney Shore, how are you currently employed?
>
> [Attorney Shore]: I am a litigator with the law firm of Tucker Arensberg[,] specializing in criminal defense.
>
> Q. How long have you been a criminal defense attorney?
>
> A. I spent three years as a prosecutor in [the] Dauphin County District Attorney's Office and then I've been a private criminal defense attorney for, wow, almost [twenty] years now.
>
> Q. Would it even be possible to ballpark how many defendants you've represented in your career?
>
> A. Thousands.
>
> * * * *
>
> Q. So you've also dealt with cases of this nature, strangulations, assaults?
>
> A. Many.
>
> * * * *
>
> Q. And generally speaking, what was your investigation into this matter, your strategy as to a defense?

_____

[5] At the time of the PCRA hearing, Roberts appears to have changed her surname to Burgos. However, for consistency, we will continue to refer to her as Roberts.

- 4 -

A. Well, that's sort of difficult to pinpoint. I think when [Hudson] and I first met, he was adamant that things did not happen as stated in the police report. We sort of went through the preliminary hearing phase of things, the meetings that we had. So my initial mindset was how can we potentially position this to have him found not guilty, get charges withdrawn, dismissed, sort of generally the way I handle all cases of that nature.

After the preliminary hearing, which I recall [Roberts] testifying, there would have been other conversations that we had in terms of strengths and weaknesses to things.

Then I think more appropriately after we received discovery, including the 911 call, which I felt was incredibly favorable to the Commonwealth, I then sort of shifted gears towards trying to have conversations with [Hudson] about my personal feelings of how I didn't think it would work out real [*sic*] well for him in a trial scenario.

So I started to shift my focus more towards what kind of a plea agreement could we possibly negotiate for him, given the fact that this was a second[-]strike case and he was looking at a [ten]-year mandatory minimum state prison sentence.

＊ ＊ ＊ ＊

Q. And what was the prejudicial evidence against [Hudson], even though he claimed this never happened?

A. So there – in my belief, there were several things. Number one, the immediacy of the 911 call and the emotions of the 911 call. The fact that a [ten]-year-old [child], who was [like] his son, was the one who initiated the 911 call. And the sort of strength and level of comments that [Roberts] made during the 911 calls. I think she went so far as to say that she felt he was going to kill her or there were significant statements that were made that certainly raised my antennas at that time.

There were some injuries. They weren't significant in my opinion. They did, I think, at least help corroborate some of [Roberts'] testimony on the 911 call, although, I still believed, you know, [Hudson's] version of events would have explained away those injuries to a degree[,] which we tried to highlight at trial. Unfortunately, the jury felt otherwise.

Q. And what was [Hudson's] version of events?

A. [Hudson's] version was, and again, I'm paraphrasing. Essentially, [Roberts] was incredibly intoxicated. The conversation had sort of escalated due to her intoxication and her anger with him or frustration with him. He was trying to leave the apartment. She had grabbed him. He had sort of tried to rip away from her. That's when the injury to her nose occurred and he was able to continue to try to walk out. And I believe it was his version that she sort of latched on to him and he was still walking and dragging her behind him, leading to some scrapes on her knee or both knees.

Q. And so it sounds like there would be three potential witnesses to this, [Hudson, Roberts,] and [Roberts'] son?

A. Correct.

Q. Did you ever reach out to [Roberts'] son about this? Did the son ever reach out to you?

A. No. Obviously, I think the son at that time was [ten] years old. And sort of my regular course of practice, I don't tend to rely on a [ten]-year-old's version of events, if I have to avoid it or if I can avoid it.

I also seem to recall that there was an initial portion of the police report, or at least the police had conducted a brief interview with the [ten]-year-old [son], and his statement at that time was not favorable to [Hudson]. In fact, it supported [Roberts' initial] version of events. That coupled with the fact that he initiated the 911 call, I didn't think it would be appropriate to put a [ten]-year-old [child] in the position of potentially testifying, having possibly been coached or anything of that nature under those circumstances.

Q. Were you ever given any reason, from whatever source, to believe that if you called this child[,] he would say something different than the prior two statements he gave implicating [Hudson]?

A. I'm not gonna [sic] say with a hundred percent certainty that I wasn't provided with some statements in that regard. I will say

- 6 -

that I looked through my notes in preparation for today, [and] there was nothing indicated in my notes that I had ever had any conversations with [Hudson] specifically about calling a [ten]-year-old [child] to testify.

I'm not saying that couldn't have happened, that that discussion didn't come up, I just didn't have it in my notes. And quite frankly, based upon things that I said prior, I don't know that anybody would have convinced me to call him as a witness anyway.

Did I have conversations with the [ten]-year-old [child] specifically? I did not. I do not recall having any conversations with [Roberts] related to [her ten]-year-old [son] testifying, although I did have some conversations with [her] throughout the course of this litigation.

Q. Would you please elaborate on that last claim with regard to the conversations you had with [Roberts]?

A. Sure. She had called me [on] multiple occasions. I can't say how many. Again, my sort of course of action under those circumstances is to not have direct communication with the alleged victims in cases like this. I don't want to potentially give the impression to a jury that I in any way influenced testimony that may be provided, and knowing full well that she would have been testifying at trial, I did not want to go down that road.

But it was crystal clear to me that she was going to recant, change, modify, or completely deny anything that was contained within the initial police report.

Q. Did you believe that recantation at trial would be helpful to your defense?

A. It was – it's one of the better ops [*sic*] of what I planned for at trial.

Q. And she ultimately did testify favorably for your client at trial?

A. She did.

Q. And she tried to distance herself from prior reports?

A. She did. And from what I recall, too, she had admitted that she was struggling with a number of issues at that time, including alcohol abuse. I think there was some depression issues. And she also admitted during testimony that she had been drinking excessively [the day of the incident].

* * * *

Q. . . . When she called you and would relate these things, did that substantially align with her trial testimony?

A. I'm not gonna [*sic*] – I think the ultimate premise that things didn't happen as they were originally reported, yes. [The] multiple conversations that I had with her aligned with that. I'm not gonna [*sic*] say that all of her telephone calls aligned exactly the same each time. There were varying degrees of distortion, differences with the way she was portraying things.

Q. So during these calls to you, she gave you multiple versions of the same event?

A. Yes, I would say that there were differing versions.

Q. Did you have an opinion as to her credibility as a licensed professional attorney?

A. I didn't find her to be credible one way or the other. It was difficult for me to sort of understand what her – what her design was.

Q. Sure. Do you think that attempting to interview her prior to trial would have increased your chances of success at trial at all?

A. I don't, nor do I feel it would have changed anything in terms of my strategy at that particular point in time.

* * * *

[PCRA Counsel]: . . . During [your twenty-five] years [of practicing criminal law], have you had to put children on the stand as witnesses?

[Attorney Shore]: There have been times, but I would say not in cases like this. It was more so in cases involving maybe PFA

matters, sort of things that didn't involve kids directly. And by that[,] I mean the fact that this individual initiated the 911 call, I was a bit hesitant to try and rely on that [ten]-year-old [child] at that time.

* * * *

Q. Do you recall at the time of the incident in question here [that] the child was [ten] years old. Is that your recollection?

A. Yes.

Q. By the time of trial, he would – which is two years later, roughly two years later, he was [twelve] years old. Would you have felt more comfortable calling a [twelve]-year-old [child] to the stand [rather] than a [ten]-year-old [child]?

A. Not really to be honest with you. Having kids of my own and understanding the memory issues with kids, whether they're [ten] or [twelve] and their ability to remember things between those age brackets, I would have been less likely to think about him as a witness, even with that age difference.

Q. But with your experience and skill, you are more than capable of handling a child witness if they are called to the stand. Is that fair to say?

A. I would like to think so.

Q. And you would – would you agree with me that the court [and the Commonwealth] would treat a child witness very gently?

A. I'm quite confident this particular court would[, and that the Commonwealth would not have any issues with the child's testimony].

* * * *

Q. Would you agree with me that . . . even though he was a [ten]-year-old child at the time, he was an eyewitness to this; correct?

A. At least a part of it, yes, from what I understand.

Q. And you didn't feel that as an eyewitness it was important to at least meet with him and speak to him on the phone?

A. Based upon what was contained within the initial police report and what I heard on the 911 call, no.

* * * *

Q. Did . . . Hudson ever request or ask you to go to speak with [Roberts'] son?

A. I don't recall us having that conversation. And again, I'm not saying that it didn't come up, I don't have anything in my notes or in my file where we discussed [Roberts' son] testifying. My recollection is our conversation focus[ed] more on . . . Robert[s'] testimony and her personal issues so to speak.

* * * *

Q. [Y]ou stated that there were a number of telephone calls. She claims that there was only one, so let me go to that for a second. Go ahead.

A. I think there – I recall multiple times that she reached out to my office to discuss things or to attempt to discuss things and I had tried to sort of cut that off or at least limit what we were discussing. I can't speak for her recollection. I recall multiple times that I spoke with her on the phone.

* * * *

Q. . . . Did [Roberts] ever raise with you in any of the communications you've ever had with her the issue of you meeting with or talking with her son . . .?

A. I do not recall it.

Q. Okay. Were there any other reasons, besides his age, that you would not have spoken to [Roberts' son], the material eyewitness to things?

A. I understand. Based, again, on what I stated previously, the initial reports that he provided to police as well as the 911 call.

\* \* \* \*

Q. And you never considered bringing [Roberts' son] as a witness?

A. It was not part of my trial strategy.

Q. Did you disclose that to . . . Hudson?

A. Again, I don't think we ever discussed [Roberts' son] potentially testifying.  If we did, I can assure you that I would have informed him that under the circumstances I did not think it should be part of our trial strategy.

Q. Understood.  With respect to . . . Roberts, . . . the alleged victim in this case.

A. Sure.

Q. What was your reluctance with communicating with her?  Why were you reluctant?

A. I just simply did not want – knowing that she was going to be testifying as the Commonwealth's number one and potentially only witness, I did not want to create or present a possible scenario where it could be implicated that I was trying to influence her testimony in any way, shape, or form.  It was crystal clear to me that she would be testifying favorably for [Hudson,] and I didn't want to do anything to disrupt that.

Q. But there was no ethical prohibition on you speaking with her, was there?

A. No.  I mean, I certainly understand and appreciate the fact that I have the ability to talk to a victim in a matter.  I just – based upon what she had provided to me, I relied on that.  I think she testified consistently with that representation.  So I'm not sure that speaking with her in any more direct fashion would have created any better scenario for us trial[-]wise.

\* \* \* \*

Q. . . . Did . . . Roberts ever specifically ask to meet with you or to at least do it by phone where she could explain her version of

events in more than just a passing comment or two in a telephone call?

A. I don't know if she specifically requested that or not. I can't recall.

Q. . . . Were those statements that she gave at trial consistent with the prior statement she had given you?

A. Yes.

Q. Were her statements at trial – her testimony at trial, was that consistent also with what . . . Hudson had told you? And by that, I mean, I know that's overbroad, but that . . . Roberts was drunk on the date of the incident . . .?

A. As far as her intoxication, absolutely. That was in keeping with what [Hudson] had told me.

Q. Was her testimony that she was belligerent towards . . . Hudson, was that consistent with the prior statements she had given you?

A. I can't state what her specifics were about her belligerence. I know there was – her position was that she did not want him to leave. Everything was initiated by her. She was the one that caused the episode.

Belligerence, I don't – I can't really speak to that. I don't think – at least it wasn't my understanding that she was being real belligerent with him. It was just that she was upset that he was upset with her for being intoxicated and she didn't want him to leave.

\* \* \* \*

Q. [Did Roberts] ever explain to you how [her] injuries came about?

A. I relied more on what [Hudson] told me as far as how those injuries came about and how we crafted that for our trial strategy.

\* \* \* \*

- 12 -

Q. In any of your communications with [Roberts,] did she ever verify [Hudson's] version of events with respect to . . . the injury to [her] nose?

A. The limited conversations that we had, I don't know that we got deep enough into it where it was specific enough to discuss the injuries. But I do recall that the conversation was from her standpoint [she] was trying to prevent him from leaving, so it was consistent in that regard.

* * * *

Q. And final question. Hindsight being what it is, is there anything that you wish you would have done differently at trial in this case?

A. Yeah, I wish I would have been able to force him to take the three- to six-year plea agreement.

Q. Other than that, no change in strategy or witnesses that you would have called?

A. I don't – I don't think things could have, from a testimonial standpoint, come out more beneficial for us. I felt at that time[,] and I still feel to this day[,] that the 911 call is probably what steered the jury more than anything and was my biggest fear in taking this case to trial. I really can't think of anything that I would have done differently strategically.

N.T., 4/24/25 at 4-21, 24 (unnecessary capitalization omitted).

We now provide the relevant portions of testimony provided by Hudson,

Roberts' son, and Roberts, respectively, as follows:

[PCRA Counsel]: Did you ever talk to [Attorney Shore] about having . . . a communication with . . . Roberts to determine where she was gonna [*sic*] go with her testimony?

* * * *

[Hudson]: [Attorney Shore] told me one time that [Roberts] reached out to him. He specifically told me verbatim ["]I told her to contact the DA.["] He never said anything to me again about any type of communications with her or anything, multiple

- 13 -

communications or anything like that. It was one time he told me that he told her to contact the DA.

Q. Understood. So moving away from . . . Roberts for a moment. Let's talk about [her son]. . . .

* * * *

Q. Did you ever have any conversations with [Attorney] Shore where you asked or suggested that he communicate with [Roberts' son] to get [his] version of events?

A. He never brought it up to me.

Q. Did you bring it up to him at all?

A. I spoke to him early on about it, but the conversation . . . didn't go anywhere.

* * * *

Q. Are you and . . . Roberts still together?

A. Yes.

Q. How soon after the incident . . . did the two of you get back together?

A. I want to say about three weeks.

* * * *

[PCRA Counsel]: [On the night of the incident, w]hat did you see?

[Roberts' son]: What – like, I saw [Hudson] was trying to leave but, you know, my mom was also, of course, begging him to stay. And then she was being loud so, you know, he was just trying to calm her down and she was just – I don't know. And then she told me to call 911 and I did because I was crying and I was a little scared[,] so I exaggerated. I didn't even know what happened.

* * * *

- 14 -

Q. At any time did you see . . . Hudson put his hands on your mom in any way?

A. No, he did not.

* * * *

Q. . . . Were you aware that later . . . Hudson had to go to trial for this?

A. Yes.

Q. At that time[,] if his attorney had spoken to you through your mother or had communicated with you in some way and asked you if you would be willing to talk about this then, would you have been willing to do so?

A. Yes.

* * * *

[PCRA Counsel]: . . . Do you recall having conversations with [Attorney] Shore?

[Roberts]: One time.

Q. And your recollection [is that] it was just once?

A. Yeah.

Q. Was that by phone?

A. Yes.

Q. And how did he respond?

A. He told me he couldn't meet with me because I'm a witness and I needed to call the DA.

Q. Did you also call him additional times, meaning [Attorney] Shore?

A. Yeah.  I called him one time before that[,] but he didn't answer.

Q. Did you speak to somebody else in his office?

A. No.

Q. Did you ever state to [Attorney] Shore anything about [your son]?

A. No.

Q. You never – you never raised with [Attorney] Shore –

A. Oh, yeah, I was just like my son was there, too, he was a witness. Like my son was present at the time, but he didn't want to hear none of that. He was just like[,] I can't speak with you.

*Id*. at 29-30, 35-36, 47-49, 68-69.

On June 4, 2025, the PCRA court dismissed Hudson's petition. Hudson thereafter filed a timely notice of appeal, and both he and the PCRA court complied with Pa.R.A.P. 1925.

Hudson raises the following issue for our review, "[w]hether the [PCRA] court erred by dismissing [Hudson's PCRA] petition because the court's findings of facts were not supported by the record and/or its conclusions of law are not free from legal error." Hudson's Brief at 9.[6]

_____

[6] We note with disapproval that Hudson's statement of questions presented fails to adhere to our rules of appellate procedure by "stat[ing] concisely the issues to be resolved[.]" Pa.R.A.P. 2116(a). Indeed, the issue that Hudson presents to this court is overly broad to the extent it does not indicate which of the multiple issues that he raised in his dismissed PCRA petition require further review by this Court. Nevertheless, because this defect does not inhibit meaningful review of the ineffectiveness claims that Hudson purported to raise within his statement of questions presented, we decline to dismiss his appeal. *See* Pa.R.A.P. 2101 (instructing that "[b]riefs . . . shall conform in all material respects with the requirements of these rules as nearly as the
*(Footnote Continued Next Page)*

Our standard of review of an order dismissing a PCRA petition is well-settled:

> We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

**Commonwealth v. Ford**, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations omitted).

This Court's review of Hudson's brief reveals two distinct issues concerning whether Attorney Shore rendered ineffective assistance. As these issues are interrelated, we will address them together. In assessing a claim of ineffective assistance under the PCRA, we presume that counsel has rendered effective assistance. **See Commonwealth v. Reid**, 259 A.3d 395, 405 (Pa. 2021). To overcome this presumption, the petitioner must show that:

> (1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability

---

circumstances of the particular case will admit, otherwise they may be suppressed, and, if the defects are in the brief . . . of the appellant and are substantial, the appeal or other matter may be quashed or dismissed").

that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Id*. (citation and quotation marks omitted). The petitioner must satisfy all three prongs of this test to obtain relief under the PCRA. *See id*. Accordingly, the failure to satisfy any one of these prongs will result in the rejection of the petitioner's ineffectiveness claim. *See id*.

Additionally, where a PCRA petitioner claims that his counsel was ineffective for failing to call a witness at trial, a petitioner may only satisfy the prejudice prong of the ineffectiveness test by pleading and proving:

(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

*Commonwealth v. Selenski*, 228 A.3d 8, 16 (Pa. Super. 2020) (citation omitted and formatting altered).

Initially, Hudson argues that Attorney Shore rendered ineffective assistance as counsel by failing to either: (1) interview Roberts' son, an eyewitness to the alleged crime, prior to trial; or (2) call Roberts' son to testify at trial. In support of this claim, Hudson points to the statement and testimony provided by Roberts' son during the evidentiary hearing, which he believes "unequivocally established that [Roberts' son] . . . did not see [Hudson] lay his hands on [Roberts,] or assault or strangle her in any way." Hudson's Brief at 24. Accordingly, Hudson maintains that because Attorney

Shore "never contacted or interviewed [Roberts' son] about what he saw or heard[,]" even though Attorney Shore "knew of his central role in the case," and that he "was still living in Harrisburg at the time of trial and was available to testify if called upon to do so[,]" this inaction "prejudiced [Hudson's] ability to put on a complete defense" by "depriving the jury of key eyewitness testimony which they may have found sufficient to acquit [Hudson] of the charges leveled against him." *Id*. at 24, 40, 42. Similarly, Hudson avers that because this testimony would have at the very least "tilted the weight of the evidence in [Hudson's] favor by casting further doubt on the Commonwealth's evidence and [Roberts' initial] statements" to police on the night of the incident, he further "contends that [Attorney Shore] had no reasonable basis not to interview [Roberts'] son, or to call him at trial." *Id*. at 43-44.

As for his second ineffectiveness issue, Hudson argues that Attorney Shore rendered ineffective assistance by failing to interview Roberts following her attempt to speak with him and provide him with "the correct version of events" prior to trial. *Id*. at 36. Specifically, Hudson claims that because Attorney Shore "knew, or should have known, that [Roberts'] testimony could have been favorable to [Hudson, he] should have interviewed her as part of his trial preparation." *Id*. at 38. Whereas Hudson acknowledges that Attorney Shore has a "stated practice of not speaking to victims — so as to avoid the appearance of trying to 'influence' them," he nonetheless maintains that this

practice "does not trump [Attorney Shore's] obligation to provide effective assistance of counsel, and pursue every legitimate avenue of defense[.]" *Id*. Thus, Hudson maintains that because Roberts could have provided Attorney Shore "with additional information that might have aided in [Hudson's] defense[,]" Attorney Shore's failure to interview Roberts prior to trial was both unreasonable and prejudicial to his case. *Id*.

The PCRA court determined that Hudson's issues were without merit, reasoning as follows:

> Here, Attorney Shore offered his reasoning for not interviewing [Roberts] or her son in preparation for trial. Specifically, as it pertains to Attorney Shore failing to call [Roberts'] son as a witness at trial, we fail to see how the outcome at trial would have been any different had [he] testified. Attorney Shore explained that he considered [Roberts'] son's potential testimony in conjunction with his statements during the 911 call and the statement he made to the police. After considering the potential impact the emotional 911 call might have on the jury, Attorney Shore felt it best not to call [Roberts'] son as a witness. Because the majority of testimony [Roberts'] son would have offered would have been unfavorable to [Hudson], we cannot agree that counsel was ineffective. Further, Attorney Shore stated that he knew [Roberts] was going to recant and deny the statements she made during the event that led to [Hudson's] arrest. Attorney Shore's actions were entirely reasonable. Having the young boy testify to something different than what he said on the 911 calls and prior statement would have smacked of deceit.
>
> Further, we fail to see how Attorney Shore's failure to interview [Roberts] would have made any difference in the testimony she presented at trial, or the determination the jury ultimately made. Notably, [Roberts] did testify at trial. Again, not interviewing her prior to trial was a reasonable trial strategy by [Attorney Shore]. As such, [Hudson] has failed to show that [Attorney Shore's] actions lacked an objectively reasonable basis.

Finally, in order for [Hudson] to prove he is entitled to relief on this claim, he has to show that he was prejudiced by his counsel's errors and that the result of the proceeding would have been different. Based on the foregoing discussion, we do not find that the trial would have resulted in an acquittal of the charges had [Roberts'] son testified, or the result would have been altered had Attorney Shore spoken with [Roberts] before trial. Thus, we do not find that [Hudson] was prejudiced by [Attorney Shore's] actions.

PCRA Court Opinion, 7/24/25, at 4-5.

Based on our review of the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the PCRA court's determination — that Attorney Shore did not render ineffective assistance of counsel by failing to either interview Roberts or her son prior to trial, or by failing to call Roberts' son as a witness at trial — was supported by the record and without legal error. As it relates to Hudson's first claim that Attorney Shore was ineffective for failing to either interview Roberts' son prior to trial, or call him as a witness at trial, we reiterate that Hudson needed to show that Attorney Shore had no reasonable basis for his inaction. *See Reid*, 259 A.3d at 405. Here, Attorney Shore explained that although he could have contacted Roberts' son prior to trial or called him as a witness at trial, he ultimately chose not to do so because Roberts' ten-year-old son: (1) was the one who initiated the emotional 911 call reporting the underlying incident to police; and (2) provided a statement to police in support of his mother's initial recollection of events whereby Hudson had attacked and strangled her. *See* N.T., 4/24/25 at 6-8. While we acknowledge that Roberts' son stated, during the PCRA

evidentiary hearing, that if he had been called to testify at trial, his testimony would have supported Hudson's version of events, we emphasize that the record does not provide any indication that Attorney Shore would have known that he would recant the statements that he made in the 911 call and to police, and instead testify in Hudson's favor at trial.

Notably, Attorney Shore testified that during his conversations with both Hudson and Roberts prior to trial, he could not recall any discussions with them regarding Roberts' son testifying as an eyewitness; indeed, Attorney Shore explained that he was unable to locate any such reference to this topic within his pretrial notes. *See id*. at 8-9. Similarly, neither Hudson's nor Roberts' testimony during the evidentiary hearing suggest that either informed Attorney Shore that Roberts' son would recant the statements that he made in the 911 call and to police, and instead testify favorably for Hudson at trial, if called to do so. *See id*. at 35-36, 68-69. Consequently, because the evidence available to Attorney Shore prior to trial suggested that Roberts' son would relay a narrative matching that which he originally provided to police and the 911 dispatcher on the night of the incident — a narrative that directly supported the Commonwealth's case against Hudson and would have been damaging to Hudson if recounted at trial — we conclude that Attorney Shore had a reasonable basis for his inaction in this matter. Thus, as we determine that Hudson failed to satisfy the reasonability prong of the

ineffectiveness test, we hold that his first ineffectiveness issue is necessarily without merit. *See Reid*, 259 A.3d at 405.

As it pertains to Hudson's second ineffectiveness claim — that Attorney Shore was ineffective for failing to interview Roberts prior to trial — we likewise conclude that the issue is meritless. Here, the record shows that although Attorney Shore did not interview Roberts prior to trial, it was nonetheless "crystal clear to [him prior to trial] that she was going to recant, change, modify, or completely deny anything that was contained within the initial police report." N.T., 4/24/25 at 9. As such, when Roberts eventually testified in accordance with this notion at trial, Attorney Shore explained that he was already prepared to use this testimony in support of Hudson's defense, and that it had been a key component to his trial strategy. *See id*. Consequently, because interviewing Roberts prior to trial would not have measurably changed Attorney Shore's actions at trial, as he readily admitted when asked as such during the evidentiary hearing, we conclude that it is unlikely that the outcome of Hudson's proceeding would have been different but for Attorney Shore's specified inaction in this matter. *See id*. at 11, 17. As a result, we hold that Hudson's second ineffectiveness claim is meritless for failing to satisfy the prejudice prong of the ineffectiveness test. *See Reid*, 259 A.3d at 405.

As the PCRA court's determination that Hudson's ineffectiveness claims lacked merit is supported by the record and without legal error, we affirm its dismissal of Hudson's PCRA petition.

Order affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/19/2026